Sandra HAMPTON, Parent and Next
Friend of Ollie Hampton, et al.
Plaintiffs,

v.

JEFFERSON COUNTY BOARD
OF EDUCATION, et al.
Defendants.

No. Civ.A. 3:98CV–262–H.

United States District Court,
W.D. Kentucky,
at Louisville.

June 10, 1999.

Teddy B. Gordon, Louisville, KY, for plaintiff.

Byron E. Leet, Francis J. Mellen, Jr., Pamela J. Ledford, Wyatt, Tarrant & Combs, Louisville, KY, for Jefferson County Board of Education and Stephen Daeschner, defendants.

Stephen T. Porter, Louisville, KY, Cecil A. Blye, Sr., Louisville, KY, Kevin J. Kijewski, Galen A. Martin, Kentucky Fair Housing Council, Inc., Louisville, KY, William N. Haliday, Louisville, KY, for Intervening plaintiffs.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The conclusions that the Court reaches in this Memorandum do not end this case. Nor do they necessarily foreshadow any particular result. However, they set forth a significant and different route to reach a conclusion. The new route should sharpen the debate on the real and important issues which this case raises. It may expose all parties to the consequences and ambiguities of their requests and their arguments. The discussion should remind us that even the scope of fundamental rights such as equal protection depends on a particular mix of history, circumstance, and legal precedent.

Today's decision plays out against the backdrop of a great controversy surround-

ing the American idea of equality. That controversy extends to the Equal Protection Clause's expression of the idea:

No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws.

The debate arises not because anyone doubts that the right is fundamental. After all, long before 1868 our founders declared that "all men are created equal." Arguments rage on because so many people conceive different definitions of equality. This case will require the Court to explore various different conceptions of equality which for decades have bedeviled ordinary citizens, politicians, sociologists, and, of course, judges.

The Fourteenth Amendment guarantees citizens the right to send their children to public schools free from state-imposed segregation and free from the vestiges of such discrimination. The same amendment protects them unequal treatment as a result of a racial classification. Judge John Minor Wisdom may have best summarized this tension when he wrote:

The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and undo the effects of past discrimination.

*United States v. Jefferson County Board of Educ.*, 372 F.2d 836, 876 (5th Cir.1966).

While this case illustrates the tension between these two seemingly parallel sides of the same right, it will not decide which is more essential. Each is fundamental. When rights conflict, individuals are often unable to enjoy the full benefit of each. Even the less ambiguous rights to free speech and freedom of religion give way in certain circumstances. Understanding and reconciling the two parallel, but sometimes contradictory, elements of equal pro-

tection may be the Court's ultimate challenge in this case. However, an essential part of judging is not merely getting the right answer to a legal issue; it is getting to the right question and requiring the combatants to address it. This opinion charts a path for doing so.

## I.

## SUMMARY

The Court has reached the inexorable conclusion that certain aspects of Judge Gordon's 1975 desegregation decree remain in force and effect. This conclusion may seem surprising. However, a thorough review of this lengthy opinion should convince the reader that the result is imminently sensible.

The Court reached this conclusion because: (1) Judge Gordon never completely dissolved the decree, though he clearly ended his supervision of it and terminated certain portions of it; (2) the Supreme Court has said that ending active supervision of a decree does not necessarily terminate the decree itself; (3) Judge Gordon did not end the Board's obligation to prevent vestiges of discrimination, such as re-emergence of racially identified schools; (4) since 1975 the Board has followed Judge Gordon's essential command; and (5) the continuing decree permits the use of racial composition guidelines, including those in the Board's current Student Assignment Plan, to prevent the re-emergence of racially identifiable schools.

Therefore, because the Board has complied with a continuing court order to prevent the reemergence of racially identifiable schools, it has not violated the Equal Protection Clause.

To obtain relief under their equal protection claim, Plaintiffs or someone must first move to dissolve the remainder of the desegregation decree. To terminate that decree, a moving party must demonstrate that the Board has continued in good faith compliance with its obligations and that it

has removed the vestiges of past discrimination to the extent practicable. If any of the parties wish to dissolve the Board's ongoing obligations under the decree, the Court will honor that request and set a hearing to determine whether any such motion is well taken.

This decision alters and clarifies the procedural steps which must occur before the Court can address Plaintiffs' equal protection claim. It does not presage any particular result. If the decree is dissolved, the Court could then consider Plaintiffs' challenge that the Board's current Student Assignment Plan violates the Equal Protection Clause of the Fourteenth Amendment.

## II.

## THE HISTORY OF SCHOOL DESEGREGATION IN JEFFERSON COUNTY SCHOOLS

This case traces the history of equal protection as applied to the public schools in Jefferson County. A full telling of that story would begin by describing the pain, inhumanity, and social degradation caused by state imposed school segregation. It would describe the individual potential which segregation suppressed; the spirit and determination of those who overcame the obstacles it imposed; and the moral strength of those who fought the legal, social, and political battle against it and other forms of discrimination. It would necessarily describe the confusion and outrage at Judge Gordon's busing order which seemed to tear this community apart as it sent children from their own neighborhoods to places that many of both races had never before seen. Finally, it would describe a school community which in many respects came together for a common purpose and worked at understanding one another well enough to overcome all these traumatic events. In doing so, at the very least, the Jefferson County

schools created something positive and workable. The Court necessarily omits but does not forget these events.

It would be convenient if equal protection defined individual rights in precisely the same way regardless of the circumstances. That is not the case. That is why understanding the circumstances is absolutely central to applying equal protection guarantees correctly and fairly. That is why the Court will spend considerable time and effort describing the history of Jefferson County school desegregation as that process evolved, along with equal protection jurisprudence, over the past forty-five years.

There is another reason for recounting the history. Those who have not traveled the full journey may want to understand how we arrived at this point. When Jefferson County schools were last segregated as a matter of law, many of the parents and none of the current students were yet born. So we should never assume too much about the current knowledge of the long struggle to produce a desegregated school system.

Knowing the past will ultimately help us make some common sense about the rules which govern our actions now. The history which the Court now recounts concerns the judicial responses to all of these events.

## A.

### City and County Desegregation After *Brown*

The history of desegregation in the City of Louisville and Jefferson County begins, as any history of desegregation must, with *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [*Brown I* ]. *Brown* established forever the constitutional principle that because "segregation of children in public schools solely on the basis of race ... deprive[s] the

children of the minority group of equal educational opportunities ... [state sponsored] [s]eparate educational facilities are inherently unequal" under the Fourteenth Amendment. *Id.* at 493–95, 74 S.Ct. 686.

To their credit, following the command of *Brown,* school authorities for the separate education systems in the City of Louisville and Jefferson County took some steps to dismantle their systems of de jure segregation. They proceeded cautiously and achieved mixed results. Nevertheless, the desegregation of local schools moved forward peacefully and deliberately, if not necessarily with speed or completeness.

1. Although officially known as the Louisville Independent School District, the boundaries of the system did not extend to the City limits. Approximately 10,000 students lived within the City limits, but outside the borders of the City school system. These students attended the Jefferson County schools. *See Haycraft v. Board of Educ. of Louisville,* No. 7291, Memorandum Opinion and Judgment, at 9 (W.D.Ky. Mar. 8, 1973) [hereinafter *Haycraft,* 1973 Mem.Op.].

2. In 1956, the district enrolled approximately 45,800 students, of whom 12,000 were black and 33,800 were white. About 26% of the City students were black. Less than 3000 students applied for transfer. *See id.* at 7 & 10.

3. The system aggressively sought black instructors, with over 80% of the new hires being black teachers during one decade-long stretch. By 1972, 36% of the district's 2200 faculty were black as were 40% of the administrative staff. *See id.* at 8 & 10. All schools had biracial faculties and the system employed a biracial administration plan, requiring that each school's principal and assistant principal be of different races. *See id.* at 18.

4. In the 1972, the City schools enrolled around 45,600 students, of whom approximately 22,600 were white and 22,900 were black. *See id.* at 10. The percentage of black population in the City increased from about 16% in 1950, to 18% in 1960, and to about 24% in 1970. The change in racial composition in the City schools seems to have resulted from an increase in the numbers of black children and from the departure of white children, either because their families physically

The City of Louisville schools[1] desegregated student assignments in the 1956 school year by a geographic attendance zone plan drawn to achieve some integration. The City schools also employed a transfer policy.[2] In the 1959 school year, the City initiated a faculty desegregation plan.[3] The City made modest progress in its desegregation efforts. All but one of its seventy-five schools at some time between 1956 and 1972[4] achieved a biracial population.[5] *See generally Haycraft v. Board of Educ. of Louisville,* No. 7291, Memorandum Opinion and Judgment (W.D.Ky. Mar. 8, 1973), *rev'd,* 489 F.2d 925 (6th Cir.1973) & 521 F.2d 578 (6th Cir.

moved from the City or because their parents chose to send them to non-public schools.

5. By 1972, though the City's six non-vocational high schools had each attained some level of integration, a number appeared to remain racially-identifiable. Central (95% black; formerly all-black), Male (97% black, although in 1956 the school was 5% black; formerly all-white), and Manual (37% black; formerly all-white) had overlapping attendance zones. The other schools reflected their geographic zones: Atherton (3% black; a formerly all-white school located outside the district lines, although it served the City), Iroquois (3% black; a new school), and Shawnee (95% black, although in 1956 the school was 5% black; formerly all-white).

The junior high schools and elementary schools displayed a similar level of modest integration depending upon their neighborhood. *See Haycraft,* 1973 Mem. Op., at 19–26. For example, among the thirteen junior high schools, DuValle (formerly all-black), Mayzeek (formerly all-black), Parkland (formerly all-white), Russell (formerly all-black), and Shawnee (formerly all-white) all had black student populations of 95 – 100%, while Barrett (formerly all-white), Gottschalk (new), Highland (formerly all-white), and Southern (formerly all-white) all had white student populations of 94 – 99.5%. *See Newburg Area Council, Inc. v. Board of Educ. of Jefferson County,* 489 F.2d 925, 930 (6th Cir.1973). The remaining four junior high schools— Manly, Manual, Western, and Woerner (all formerly all-white)—had black student populations of 25 – 64%. *See id.*

Among the forty-six elementary schools, nineteen had black student populations of 82 – 100%, while twenty-one had white student populations of 89 – 100%. *See id.* All of the twenty-one identifiably white elementary schools were formerly all-white. *See id.*

1975) [hereinafter *Haycraft*, 1973 Mem. Op.].

The County system included far fewer black students.[6] Desegregation proceeded at a slow pace. Prior to 1956, the County paid to send black high school students to attend Louisville's Central High School. Its black elementary students attended school at Newburg Elementary, a modern twenty-room school building, and in seven other one- to four-room buildings throughout the county. From 1956 to 1963, the County eliminated its all-black schools[7] and assigned black pupils by geographic district.[8] Unlike the City, the County allowed no transfers. Faculty integration did not begin until 1963 and progressed slowly.[9] By 1972, the black student population of the district had increased slightly.[10] The County's integration efforts had met with limited success at the elementary level,[11] with 56% of the black students attending just three[12] of the seventy-four elementary schools all located close to concentrations of black residents. *See generally Newburg Area Council, Inc. v. Board of Educ. of Jefferson County*, No. 7045, Memorandum Opinion and Judgment (W.D.Ky. Mar. 8, 1973), *rev'd*, 489 F.2d 925 (6th Cir.1973) & 521 F.2d 578 (6th Cir. 1975) [hereinafter *Newburg*, 1973 Mem. Op.]

### B.
### The 1973 Desegregation Lawsuits

In 1972, dissatisfied with the progress of school desegregation, several individuals and groups filed federal lawsuits against both the City and County systems. In *Haycraft v. Board of Education of Louisville* —a suit encouraged by the Kentucky Civil Liberties Union and later joined by the Human Relations Commission and NAACP—the plaintiffs contended that the City's transfer and school site selection policies perpetuated segregation, that the district had failed to integrate faculty and staff, and that the geographic, or neighborhood, school assignment system caused racially-identifiable schools. The *Haycraft* plaintiffs sought broad remedies including interdistrict measures or a merger of the City and County systems along with the small Anchorage Independent School District.

In *Newburg Area Council, Inc. v. Board of Education of Jefferson County* —a suit brought by a community organization in Newburg and joined by the Kentucky Commission on Human Rights—the plaintiffs similarly contended that school officials had maintained segregation through student assignment, busing, and school site selection policies. Specifically, the *New-*

**6.** In 1955, the County enrolled around 32,000 students, of whom 1000, or 3.1%, were black. *See Newburg Area Council, Inc. v. Board of Educ. of Jefferson County*, No. 7045, Memorandum Opinion and Judgment, at 9 (W.D.Ky. Mar. 8, 1973) [hereinafter *Newburg*, 1973 Mem.Op.].

**7.** By 1958, only five black schools remained, with a total student population of 286. *See Newburg*, 1973 Mem. Op., at 11.

**8.** The County allowed black middle and high school students to finish at their segregated schools or to attend formerly all-white schools. *See id.* at 10.

**9.** In 1955, the County employed 1066 teachers, of whom 36 were black. By 1972, the district employed 4000 teachers, with approximately 140 blacks (which was up from around 80 in 1971). In 1971, 35· schools contained integrated faculties, but by 1972 that number increased to 81 schools. *See id.* 8–12.

**10.** In 1972 the County's student population was 95,900, of whom 92,200 were white and 3700, or 4.0%, were black. *See id.* at 8.

**11.** Overall, the 74 elementary schools enrolled 46,700 students, of whom 44,900 were white and 1800, or 3.8%, were black. *See id.* at 9.

**12.** The three schools were Newburg (which was virtually all-black), the nearby and new Price, and the new Cane Run. *See id.* at 13–24. The student populations at both Price and Cane Run were split roughly equally between black and white students. *See Newburg Area Council*, 489 F.2d at 928. All three schools lay near several all-white or virtually all-white schools. *See id.* at 929.

*burg Area Council* plaintiffs attacked the concentration of black elementary students at three schools. They argued that the County had constructed Price and Cane Run schools, drawn boundaries around Newburg Elementary, and adjusted the student census at surrounding white schools all for the purpose of perpetuating nearly segregated schools. Additionally, the plaintiffs challenged the district's efforts to integrate faculty. The *Newburg Area Council* plaintiffs sought less dramatic remedies focusing mainly on faculty integration and on desegregating the three racially identifiable elementary schools, along with the more drastic remedy of merging the City, the County, and the Anchorage system.

Neither group of plaintiffs ever contended that either the City or County operated educationally unequal schools; instead, they both focused on the racial imbalances in each system as continuing vestiges of de jure segregation. *See Haycraft,* 1973 Mem.Op. at 4–5; *Newburg,* 1973 Mem.Op. at 13. In making these arguments, the desegregation plaintiffs relied heavily on the principles developed in *Green v. County School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In *Green,* the Supreme Court applied the holding of *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [*Brown II*], and required school systems to dismantle, rather than just discontinue, the practice of segregation. In the opinion's most compelling passage, the *Green* Court explained:

> In the context of the state-imposed segregated pattern of long standing, the fact that [a school district] opened the doors of the former "white" school to Negro children and of the "Negro" school to white children merely begins, not ends, our inquiry whether the [school board] has taken adequate steps to abolish its dual, segregated system.

*Brown II* was a call for the dismantling of the well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.

391 U.S. at 437–38, 88 S.Ct. 1689.

In *Swann,* the Court elaborated on the question of whether a school district operates "a system without a 'white' school and a 'Negro' school, but just schools." *Green,* 391 U.S. at 442, 88 S.Ct. 1689. The *Swann* Court said that evidence of racial imbalances in a previously segregated district creates a presumption that the district has not eliminated the vestiges of state-imposed segregation. *See* 402 U.S. at 18, 26, 91 S.Ct. 1267. More specifically, the Court held that when a district's plan includes even a small number of racially identifiable schools, the district bears "the burden of showing that such school assignments are genuinely nondiscriminatory." *Id.* at 26, 91 S.Ct. 1267. *Swann* also expressed great concern that school siting and closure decisions, when combined with neighborhood schooling, could "lock the school system into the mold of separation of the races" by "promot[ing] segregated residential patterns." *Id.* at 21, 91 S.Ct. 1267. Similarly, the *Swann* Court critiqued even racial-neutral assignment plans in previously segregated systems on the grounds that "such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation." *Id.* at 28, 91 S.Ct. 1267.

Together, *Green* and *Swann* provided the legal basis for the *Haycraft* and *Newburg Area Council* complaints. Under

*Green,* the two groups of plaintiffs argued that the Louisville and Jefferson County schools needed to do more than just end the system de jure segregation. Under *Swann,* the plaintiffs contended that the racially identifiable schools in both systems constituted evidence of the vestiges of the discriminatory system.

## C.
### Judge Gordon Finds No Vestiges of Past Discrimination and Dismisses Both Cases

Both *Haycraft* and *Newburg Area Council* ended up before Judge James F. Gordon of the Western District of Kentucky, who consolidated the actions. In March of 1973, he ruled against the plaintiffs and dismissed both cases. *See Haycraft,* 1973 Mem.Op. & *Newburg,* 1973 Mem.Op.[13]

Judge Gordon began by reasoning that the "tip ratio" (perhaps, less euphemistically described as the statistical point at which "white flight" occurs) prevented City officials from doing anything more to achieve integration: "any further efforts . . . to achieve greater racial balance will result in a system-wide tilt; thereby leaving the district blacker, and poorer and more segregated." *Haycraft,* 1973 Mem. Op. at 14–15. He concluded that school closings resulted in more integration or had little effect. *See id.* at 16–17. He determined that the City had successfully desegregated its faculty and administration. *See id.* 17–19. On perhaps the most hotly contested subject, attendance zones, Judge Gordon found that the district's boundaries did not perpetuate segregation. *See id.* at 19–26. He found no gerrymandering or other boundary manipulation. *See id.* at 24. The attendance areas tracked neighborhood lines; the demographics of each neighborhood shaped the racial composition of the schools. *See id.* at 19, 26. Judge Gordon attributed the dramatic shifts in racial makeup at certain schools (Male and Shawnee high schools, for instance) to population migration rather than to any City action. *See id.* at 22–23. The regrettable racial imbalances apparent in school system as of 1972 he suggested had their genesis in "white flight, neighborhood housing patterns and socioeconomic factors; not de jure acts or failures to act." *Id.* at 30. Judge Gordon praised the "dispatch and diligence" with which the Louisville carried out the intent of *Brown I. See id.* at 30, 91 S.Ct. 1267.[14]

Judge Gordon understood *Swann* to require close scrutiny of racially identifiable schools, but he also interpreted *Swann* to mean that "the existence of some small number of one race or virtually one-race

---

13. In a pre-trial ruling, Judge Gordon tentatively dismissed the Anchorage system as a defendant on the grounds that it contained only 300 students and would be unreasonably burdened by the litigation. *See Haycraft* 1973 Mem.Op. at 4; *Newburg,* 1973 Mem.Op. at 7–8. The Sixth Circuit reversed Judge Gordon's rulings and required interdistrict remedies, specifically authorizing the crossing of Anchorage district lines. *See Newburg Area Council,* 489 F.2d at 931–32. *But see Newburg Area Council, Inc. v. Board of Educ. of Jefferson County,* 510 F.2d 1358, 1360 n. 1 (6th Cir.1974) (allowing district court to rejoin Anchorage as defendant if deemed necessary); *Newburg Area Council, Inc. v. Gordon,* 521 F.2d 578, 580–82 (6th Cir.1975) (same). The appellate court subsequently revisited the question, however, and affirmed the dismissal of Anchorage on the grounds that, even though the system was virtually all-white, it had never engaged in discrimination. *See*
*Cunningham v. Grayson,* 541 F.2d 538, 543 (6th Cir.1976). *But see id.* at 545 (McCree, J., dissenting) (explaining that, because the Anchorage schools were created under state-imposed de jure segregation, "the Anchorage 'boundaries' were drawn in 1911 to exclude blacks not geographically, but by definition" and, therefore, the district never lost its segregated character).

14. Compared to other school districts throughout the deep South, it is certainly true that Louisville deserved some praise. *See generally* Jack Bass, *Unlikely Heroes: The Dramatic Story of the Southern Judges of the Fifth Circuit Who Translated the Supreme Court's* Brown *Decision Into a Revolution for Equality* (1981); J.W. Peltason, *Fifty–Eight Lonely Men, Southern Federal Judges and School Desegregation* (1961).

schools within a district is not in and of itself a mark of a system that still practices segregation by law." *Id.* at 31, 91 S.Ct. 1267. Accordingly, he found the Louisville school system unitary and ruled in favor of the City.

In *Newburg Area Council,* Judge Gordon determined that County racial imbalances arose due to demographics and the difficulty of integrating a relatively small number of black students who lived in the same neighborhoods. For example, he found that the fluctuations in the size of the Newburg school were produced by changes in the grades assigned to the school to increase integration in the surrounding schools. *See Newburg,* 1973 Mem.Op. at 17–18. He rejected claims that school site choices and busing rates in the Newburg area actually fostered continued segregation. *See id.* at 18–20, 24. Finally, Judge Gordon reasoned that the County Board engaged in "vigorous" efforts to desegregate the system's faculty and that it encountered difficulties because of the "reluctance of black teachers to teach in a predominantly all white school system." *Id.* at 26.

After reiterating his understanding of *Swann,* Judge Gordon concluded that the County operated a unitary school system. *See id.* at 32–33, 91 S.Ct. 1267. Only drastic remedial action, such as busing, he found, would improve the level of integration. He rejected that option as being "totally unrealistic" to transport white children into the Newburg area and black children to white schools "in order to achieve some sort of racial balance." *Id.* at 32–33, 91 S.Ct. 1267. Again, Judge Gordon ruled in favor of the County.

### D.

### The Sixth Circuit Reverses and Orders School Desegregation

On appeal, the Sixth Circuit reversed, finding vestiges of discrimination in both the City and County schools. *See Newburg Area Council, Inc. v. Board of Education of Jefferson County,* 489 F.2d 925 (6th Cir.1973). Factually, the appellate court focused on the continuing presence of racially identifiable City and County schools. Legally, the circuit panel expressed a different understanding of *Swann* than Judge Gordon. The Sixth Circuit explained that *Swann* tolerated a small number of racially identifiable schools only in the context of an " 'otherwise effective plan for dismantlement of the [segregated] school system.' " *Id.* at 928 (quoting *Northcross v. Board of Educ. of Memphis City Schools,* 466 F.2d 890, 893 (6th Cir.1972)). In a previously segregated system, the continued presence of racially identifiable schools imposed a burden on a school board to "show that the racial composition of these schools is not the result of past discriminatory action on its part." *Id.* at 931 (citing *Swann,* 402 U.S. at 26, 91 S.Ct. 1267). The Sixth Circuit concluded that the City and County simply had failed to adopt effective desegregation plans. *See id.* at 929, 931.

The Sixth Circuit found overwhelming evidence of racially identifiable schools in the Louisville system: "the evidence indicates that over 80% of the schools in Louisville are racially identifiable." *Id.* at 930. Five of six academic high schools, nine of thirteen junior highs, and forty of forty-six elementary schools remained racially identifiable. Of the fifty-six pre-*Brown* schools still operating, thirty-five retained the same racial identity. That statistic alone was enough to decide the case.[15]

The court found the City's desegregation efforts sorely lacking. Demographic changes did not excuse the board from its duty to eliminate the vestiges of segrega-

---

15. "Regardless of any explanation for the racial composition of any of the other schools in the system, the thirty-five pre-*Brown* schools that have retained their pre-*Brown* racial identification to the present day stand out as clear vestiges of state-imposed segregation." *Id.* at 931.

tion. *See id.* More importantly, the court explained that the "residual effects of past discrimination," *id.*, made it impossible for the City's geographic student assignment plan to work effectively. The neighborhood school plan merely perpetuated the racial identity of many schools. The court, then, reached the inescapable conclusion that the City did not operate a unitary schools system.

While the Jefferson County school system suffered from a much smaller number of racially identifiable schools, the Sixth Circuit found their presence no less dispositive. The court focused upon the continued racial identifiability of Newburg as a vestige of segregation. *See id.* at 929. The court concluded that, unless the County addressed that problem, it would not eliminate the dual system "root and branch" as *Green* required. *See id.* at 928–29. This finding makes tremendous sense given the small proportion of black students in the County system. Though only one pre-*Brown* school continued its racial identity, that one school accounted for a large fraction of the district's black elementary students. Therefore, it alone played a significant role in the analysis.

More specifically, the court found that the County had neglected opportunities to integrate the Newburg, Cane Run, and Price schools. The Sixth Circuit criticized Judge Gordon for accepting the County's explanation that it sent some of the Newburg community's black children to nearby white schools without having determined why the County did not assign white children to Newburg and Price. *See id.* at 929. The court condemned the County's "neutrality" as to the emerging racial identifiability of Price and Cane Run. The panel reasoned that since the school district had not yet eliminated its dual system, it faced an affirmative duty to ensure that its actions did not further segregation. *See id.* Hence, it mandated that the County "had the affirmative responsibility to see that no other school in addition to Newburg would become a racially identifiable

black school." *Id.* The Sixth Circuit directed the district court to hold "proceedings to formulate a desegregation plan for all school districts in Jefferson County." *Id.* at 932.

E.

*City and County School Merger*

Upon remand from the Sixth Circuit, Judge Gordon set to work formulating a desegregation plan as directed. During the summer of 1974, he devised Plan X, a desegregation plan that included the merger of the Louisville and Jefferson County systems. All this came to a halt, however, when the Supreme Court granted certiorari and vacated the Sixth Circuit opinion, remanding the case for reconsideration in light of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*), which limited the federal court's authority to order interdistrict remedies. *See Board of Educ. of Louisville v. Haycraft*, 418 U.S. 918, 94 S.Ct. 3209, 41 L.Ed.2d 1160 (1974); *Board of Educ. of Jefferson County v. Newburg Area Council, Inc.*, 418 U.S. 918, 94 S.Ct. 3208, 41 L.Ed.2d 1160 (1974). Ironically, the Supreme Court's action came just two days after Gordon issued his desegregation decree.

On reconsideration, the Sixth Circuit determined that *Milliken* did not prohibit an interdistrict remedy among the school districts of Jefferson County because the local school authorities had ignored and crossed district lines for the purpose and with the effect of causing segregation. *See Newburg Area Council, Inc. v. Board of Educ. of Jefferson County*, 510 F.2d 1358, 1360–61 (6th Cir.1974). Accordingly, the appellate court reinstated, with slight modifications, its earlier opinion. *See id.* at 1361.

In an unusual development, as the district court continued the proceedings, the plaintiffs in both *Haycraft* and *Newburg Area Council* filed, and the Sixth Circuit granted, a petition for a writ of mandamus

directing Judge Gordon to consolidate the cases and issue a desegregation plan effective for the 1975–76 school year. *See Newburg Area Council, Inc. v. Gordon,* 521 F.2d 578 (6th Cir.1975).

One other crucial development occurred in the same time frame: The Kentucky State Board of Education ordered the merger of the Jefferson County and Louisville school systems effective April 1, 1975. *See Cunningham v. Grayson,* 541 F.2d 538, 539 (6th Cir.1976). This significant change mooted some of previous litigation and left Judge Gordon with a markedly simpler task in constructing a desegregation plan.

## F.

### Judge Gordon's 1975 Desegregation Plan

Only thirteen days after the Sixth Circuit's mandamus on July 17, 1975, Judge Gordon brought forth a desegregation decree designed for the start of school the following month. *See Newburg Area Council, Inc. v. Board of Education,* Nos. 7045 & 7291, Judgment & Findings of Fact and Conclusions of Law (W.D.Ky. July 30, 1975) [hereinafter 1975 Judgment & 1975 Findings, respectively].[16] The plan, which the Court shall refer to as the 1975 Decree, contained nine "integral" operational components: "student assignments; schools to be closed; procedures relating to hardship; method of transportation; assignment of school employees, including teachers, administrators and other certified personnel; human relations programs; transportation schedules; procedures for enforcement and implementation; and

monitoring and reporting procedures...." 1975 Judgment at 1. Predictably, five of the nine parts addressed the process of determining which students would attend which schools and how to transport them there.

While the Judgment listed the specific areas detailed by the plan, the Findings reveal a more subtle hierarchical structure. In the top tier of that hierarchy, Judge Gordon prescribed four guiding principles or, in his words, "four factors essential to any plan which would carry out the mandate of the Sixth Circuit." 1975 Findings at 2. These essential factors were stability, equity, predictability, and simplicity. Judge Gordon expanded upon each of these concepts by providing short definitions.

The concept of stability, Judge Gordon explained, required that the plan be capable of extending over a "number of years." *Id:* He eschewed a plan that would require "constant revision from year to year" because of the accompanying "damage [to] public confidence" and to the "quality of education." *Id.* By using of racial composition guidelines, with maximum and minimum ratios, he hoped to "insure stability over an extended period." *Id.* The plan must "treat students within racial categories with equity." *Id.* To provide greater clarity, Judge Gordon offered that "equity" meant that "[n]o person or student should be required to bear an unreasonable or disproportionate burden in the desegregation of the schools." *Id.*[17] Racial guidelines formed the most important part of his plan. He set out two separate and

---

16. Judge Gordon created the desegregation plan in extensive and cooperative "shirt-sleeve" conferences relying upon the staff of the Jefferson County school system as well as expertise provided by the plaintiffs and others. *See* 1975 Findings at 1; *Haycraft v. Board of Educ. of Jefferson County,* Nos. 7045 & 7291, Memorandum Opinion, at 2–3 (W.D.Ky.1978) (describing the amicable and informal working relationship that developed between the court and the parties).

17. Judge Gordon apparently did not envision that the desegregation plan could treat white and black students exactly the same, however. He said that "[b]ecause the black students in the school system as a whole constitute only 20% of the total student body, it is inevitable that they will be required to be transported more often than white students." 1975 Findings at 2. Judge Gordon clearly meant that a plan must not impose an undue burden on either racial category given the system's demographics.

specific guidelines which formed the primary operational elements of the desegregation decree.[18] Finally, Judge Gordon specified that the "method for selecting students to be transported for the purpose of this desegregation plan insures that every student, within racial categories, participates as equally as possible." *Id.* at 3. This final point reiterated and operationalized the concept of equality.

Next, the plan contained detailed requirements for each of the nine integral components. Under the heading of "Student Attendance Areas, School Closings, and Clustering," the desegregation plan described the basic approach to desegregation. *See id.* at 4–6. While this section of the plan contained such details as a list of schools to close and a method transition from junior high schools to middle schools, its core focused on more general desegregation principles. Interestingly, Judge Gordon began this section of the plan by explaining that school officials would need to adjust the plan to reflect revisions in the demographic data.[19] Next Judge Gordon described the new student attendance areas which involved a clustering system to achieve desegregation by busing students among the various schools in each cluster.[20] *See id.* at 6.[21]

The next section of the plan, entitled "Student Assignment Methodologies," detailed how school officials would identify students for transport in each school year. *See id.* 6–11. Here, Judge Gordon described an approach that came to be known as the "alphabet plan." Under this system, whether students attended their "district school" or whether they were bused in each year depended upon the first letter of their last name. The plan included an especially detailed transportation logistics program with provision for monitors on all buses transporting students "for the purpose of desegregation." *Id.* at 15. Judge Gordon provided special procedures for first graders, exempting them from busing during the first quarter of the school year. *See id.* 6–7. Eventually, because of the limited availability of buses, Judge Gordon exempted first graders from the plan for the first two years. *See Haycraft v. Board of Educ. of Jefferson County,* 585 F.2d 803, 804 (6th Cir.1978).

The remainder of Judge Gordon's plan addressed items of great importance at the time, but which may have little role in the current litigation. Judge Gordon required that the school system assign certificated staff "so that the racial composition of a specific school staff [did] not indicate that the individual school was intended exclusively for white students or black students." 1975 Findings at 14. The plan further provided that, in all areas of the system, the racial make-up of the staff (including teachers) should "parallel the

18. First, Judge Gordon established the racial composition guidelines for elementary schools with the requirement that every school enroll a black student population of no less than 12% and no more than 40%. *See id.* at 3. Next, the judge provided the racial composition guidelines for secondary schools, mandating that each school have a black student population of no less than 12.5% and no more than 35%. *See id.*

19. "It is important that the community understand that the demographic data and student attendance figures reflect the best available information to the Court and that any demographic changes in the county since the time the figures were obtained may cause some inaccuracy which will require minor revision of this plan. The school administration will

make the appropriate revision as part of the implementation of this plan." *Id.* at 4.

20. "The Court has therefore, as part of the plan, clustered and paired black schools with white schools and requires the Jefferson County Board of Education to transport students between these schools in order to achieve the appropriate desegregation of the school system." *Id.* at 6.

21. The new attendance zones actually created racial compositions within guidelines at fifteen elementary schools, three middle schools, six junior high schools, and six high schools. Judge Gordon declared these institutions desegregated and excluded them from the busing program laid out later in the plan. *See id.* at 5.

racial composition of the staff in the entire system." *Id.* Several sections of the plan detailed Judge Gordon's power to monitor and enforce the desegregation process through the appointment of a Magistrate or Special Commissioner. Finally, Judge Gordon rounded out the enforcement sections by cautioning the public to follow his orders and by explaining his intent "to guarantee the safety of the children affected by my judgment." *Id.* at 22.

Judge Gordon's desegregation plan was appealed on multiple fronts. The Sixth Circuit consolidated the various challenges and affirmed Judge Gordon. *See Cunningham v. Grayson,* 541 F.2d 538 (6th Cir.1976). That opinion provided some crucial guidance on the validity of the racial composition guidelines. The Sixth Circuit explained that the plan permissibly employed flexible ratios, or ranges, based on the racial composition of the student population of the school system. *See id.* at 542. To have promulgated rigid percentages would have been an abuse of discretion. *See id.* On the other hand, even with the range of percentages, the district court could not require "year-to-year realignment to correct non-state-action caused divergencies from the racial guidelines."

*Id.* The *Cunningham* court rejected any contention that the absence of black majority schools under the guidelines posed a constitutional problem.[22] Finally, the court considered and rejected a challenge to the plan on the grounds that it burdened black students disproportionately.[23]

After initial implementation, Judge Gordon modified the desegregation plan a number of times in both large and small ways. One of the district court's adjustments led to yet another round of litigation. In 1976, Judge Gordon ordered the transportation of additional black students to achieve desegregation of the system's elementary schools. The Board objected on the grounds that the district court violated the rule established by *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 434–36, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), which prohibited a district court from requiring perpetual readjustment of attendance zones following the district's compliance with the order.[24] Judge Gordon found that *Spangler* did not apply because the Board had never come into compliance in the first case. The Board appealed and the Sixth Circuit affirmed Judge Gordon. *See Haycraft v.*

**22.** The court stated: "That the plan will leave no school with a black majority is permissible." 541 F.2d at 542. The court apparently based this conclusion on the relative proportion of black and white students in the Jefferson County system. The panel cited *United States v. School District of Omaha,* 521 F.2d 530, 547 (8th Cir.1975), as authority for its statement. In that case, like in Jefferson County in 1975, black students accounted for approximately 20% of the student population. Presumably, if black students accounted for a significantly larger percentage, then the conclusion about black majority schools would need reconsideration.

**23.** However, the Sixth Circuit stated that "black plaintiffs have not complained of being unnecessarily burdened in the desegregation process," *id.,* thus, suggesting its willingness to weigh the justification for imposing such a burden if appropriately challenged.

**24.** The most telling passage from *Spangler* begins by quoting *Swann*'s statement that a

unitary system is under no constitutional duty to make annual adjustments to the racial composition of student populations absent government action. *See Swann,* 402 U.S. at 31–32, 91 S.Ct. 1267. The *Spangler* Court then explained:

In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. No one disputes that the initial implementation of this plan accomplished *that* objective. That being the case, the District Court was not entitled to require [the Pasadena school district] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court has fully performed its function of providing the appropriate remedy for previous racially discriminatory patterns.
427 U.S. at 436–37.

*Board of Educ. of Jefferson County,* 560 F.2d 755, 755–56 (6th Cir.1977).

## G.

### Judge Gordon Ends Active Supervision of Schools in 1978

Judge Gordon spent three years actively overseeing the 1975 desegregation plan. In the Spring of 1978, he took up the question of closing the case. On June 15, 1978, Judge Gordon removed the consolidated case from the court's active docket and declared the public schools of Jefferson County unitary. *See Haycraft v. Board of Education of Jefferson County,* Nos. 7045 & 7291, Memorandum Opinion & Final Judgment (W.D.Ky. June 15, 1978) [hereinafter 1978 Mem.Op. & 1978 Final J., respectively]. A central question for this Court is what to make of the 1978 decision.

Judge Gordon began his 1978 opinion by "declaring the complete successful implementation of the Court's desegregation order herein of July 30, 1975, as amended." 1978 Mem.Op. at 1. The Board, he found, had faithfully executed the plan by achieving pupil desegregation, staff desegregation, and compliance with the monitoring process. For example, Judge Gordon effusively praised the Board's good faith efforts to comply with the racial composition guidelines, to meet the court's monitoring requirements, to improve the implementation of the order, and to bring state lawsuits to ensure the success of the desegregation plan. *See id.* at 4–8. He lauded the Board's efforts to achieve substantial compliance with the racial composition guidelines at every school for at least a

substantial period since the imposition of the 1975 Decree. *See id.* at 9 & 11. He rejected the argument that classroom segregation undermined school integration. Classroom racial composition, he found, depended upon individual student choice rather than state action. *See id.* 12–16. In the paragraphs on staff desegregation, Judge Gordon found the system in "substantial conformity" with the 1975 order. *Id.* at 16. Accordingly, Judge Gordon declared that "implementation of [the] amended desegregation order has produced a unitary school system in Jefferson County, Kentucky." *Id.*

Throughout the opinion, Judge Gordon focused on the crucial importance of the racial composition guidelines, referring to them as the "primary touchstone or determinant," *id.* at 4, of the desegregation order.[25] He reiterated that the purpose of the desegregation plan was to "radically alter the racial composition of virtually every school in the school system." *Id.* He described the racial guidelines as central, not only in producing those radical changes, but also in "assaying whether or not the school system, upon implementation of the desegregation plan, had indeed become a unitary school system." *Id.*

While Judge Gordon explicitly ended some components of the plan and impliedly ended others, he clearly intended to continue some aspects of the order. The opinion is replete with reference to the "continuing nature" of the 1975 Decree, its ongoing "good faith implementation" and about the Board's assuming the "yoke" of responsibility for the ongoing order.

**25.** Interestingly, the 1978 opinion offered some explanation for the difference between the treatment of elementary and secondary schools by detailing the changing enrollment pattern in the school district. As explained previously, the desegregation order prescribed that each elementary school must contain a student population of between 12% and 40% black students and each secondary school must contain a student population of between 12.5% and 35% black students.

(Judge Gordon treated Newburg separately and capped its black enrollment at 37%.) In 1978, the student population in first grade was 29.4% black but decreased gradually to a 21.5% black student population in sixth grade. *See* 1978 Mem.Op. at 10–11. In other words, the distinction between the elementary and secondary levels appears to correspond to a different composition of the student population.

Surveying the entire Memorandum and the Final Judgment, there is no doubt that Judge Gordon closed the door on his "intimate involvement with the administration of the Jefferson County school system. 1978 Mem.Op. at 19.[26] In doing so, he began the process of returning to the Board 'the plenary power ... to set educational policy.'" *Id.* He also left some portions of the desegregation decree in place. Exactly what portions remain and their legal effect are among the important questions which the Court will answer in this Memorandum.

## H.

### Judge Ballantine Declines Not to Reopen Case in 1985

The final relevant decision came down in 1985. At that time a number of the original plaintiffs petitioned the Court to reopen the case and require the Board to expand its integration efforts. They argued that the Board was not doing enough. Judge Ballantine declined to "restore the case to the active docket for the purpose of modification of the final judgment and desegregation order." *Haycraft v. Board of Education of Jefferson County,* Nos. 7045 & 7291, Memorandum, at 1 (W.D.Ky. Sept. 24, 1985) [hereinafter 1985 Mem.Op.].

Judge Ballantine began by approvingly tracing the Board's continuing efforts to maintain Judge Gordon's racial balance percentages. *See id.* at 2–3. He opined that the "original alphabetical assignment of students was at best only temporarily effective." *Id.* at 2. For example he noted a number of demographic changes that necessitated several innovations enacted by the Board to ensure its compliance with the desegregation order:

> Because of changes in the demographic makeup of the community, by 1983 there were a number of schools which no longer met the 1975 guidelines. Thereafter, in 1984, with the assistance and advice of a representative citizens committee and other interested persons and organizations, the school board developed a plan by which students are assigned based on locations of their residence. In order to achieve an appropriate racial balance in each school, the perimeters of each school's attendance zone are, of necessity, somewhat arbitrary, even to the point of gerrymandering. In addition to the redrafting of school zone boundaries, so-called "magnet" schools were established. These innovations resulted in restoring the racial balance mandated by Judge Gordon.

*Id.* at 3. These modifications apparently did not please at least some of the original desegregation plaintiffs.[27]

Judge Ballantine's refusal to reopen the case rested entirely on Judge Gordon's 1978 decision. He characterized that decision as embodying Judge Gordon's "judgment holding that the dual system had been eliminated" and as demonstrating Judge Gordon's "satisfaction that there remained no vestige of either *de facto* or *de jure* segregation in the Jefferson County schools." *Id.* at 5–6. The judge rejected the motion to reopen the case on the grounds that the plaintiffs introduced no

---

**26.** The Final Judgment included a number of additional orders removing the court's active supervision: first, Judge Gordon ordered the "matter stricken from the active docket of this Court for the purposes of all issues" and ordered the Clerk to close the file; second, the judge discharged Special Master Balthis and ordered him to deliver his records to the court; third, he terminated the data reporting duties included in the 1975 order and in a 1976 order (although the court imposed some different duties on the Superintendent, as not-

ed above, these new duties involved reports to the Board, rather than the court); and fourth, Judge Gordon ordered payment of certain legal fees to plaintiffs' counsel.

**27.** As the judge explained: "The innovations were not universally accepted and, after a protracted series of meetings and discussions, the present plan was adopted and approved by all interested parties and organizations. After the plan was approved, the pending motion was filed." *Id.*

evidence that the Board's actions led to resegregation. *See id.* at 7. As Judge Ballantine explained: "This Court reads [*Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) ] as proscribing judicial intervention for the sake of supervision. The common thread of all the cases cited is that once the constitutional violation has been remedied, absent a showing of it's renascence, the federal courts must not interfere with the traditional functions of the school board." *Id.* at 8.

Because he ruled in favor of the Board, one might interpret Judge Ballantine decision as an endorsement of the Board's arguments. That was not the case. The Board vigorously argued that Judge Gordon's 1978 finding of unitariness dissolved a preliminary injunction. *See generally* Defendants' Response to Plaintiffs' Motion to Restore Case to Active Docket for the Purpose of Modification of Final Judgment and Desegregation Order & Defendants' Rebuttal Memorandum, *Haycraft v. Board of Education of Jefferson County,* Nos. 7045 & 7291, (W.D.Ky. Sept. 24, 1985). Nowhere in his decision did Judge Ballantine address these specific substantive arguments advanced by the Board.

Like his predecessor, Judge Ballantine may have recognized that an element of ambiguity acts powerfully. Each judge skillfully held out the threat or possibility of future intervention to ensure continuation of existing policies. Since the Board continued to follow the essence of the Decree, Judge Ballantine undoubtedly saw no reason to interject himself. Whatever Judge Gordon ordered, Judge Ballantine left unchanged.

Since 1985, the Board has twice changed its assignment plan. In 1991, the Board eliminated the alphabet plan and mandatory busing entirely and instituted a student choice system. *See* Stipulated Exhibit # 19, Detailed Description of the District's Managed Choice Student Assignment Plan, at 1 (not dated). In 1996, the Board adopted the current plan.

III.

The Current Student Assignment Plan

A lengthy process of expert consultation and public input shaped formulation of the 1996 "managed choice" plan (the "Student Assignment Plan"). *See generally* Stipulated Exhibit # 14, Consultant's Report on the Current Student Assignment Plan (Oct. 24, 1994); Stipulated Exhibit # 15, Student Assignment Monitoring Committee Presentation (March 11, 1996); Stipulated Exhibit # 16, Student Assignment Plan, Analysis of Community Forum Responses (Apr. 2, 1996); Stipulated Exhibit # 17, Student Assignment Survey, Summary of Findings (July 1996). The present plan is the Board's effort to accommodate a range of competing interests, including allowing parents the opportunity to participate in the selection of their child's school, affording stable and integrated student assignments, and offering specialized programs including magnet schools, optional programs, and career academies. Overall, the plan includes an impressive array of educational opportunities for students of all interests and abilities in facilities throughout the county. *See* Stipulated Exhibit # 19 at 1.

The present plan begins with four goals:

1. The school district shall maintain educational and financial equity among all school children in the district by providing substantially uniform educational resources to all students in the district regardless of the location of their school, the racial composition of their school, or the type of educational program in which they are enrolled....

2. ... All Jefferson County Public Schools students will perform at higher levels of academic achievement in areas of basic skills and critical thinking skills in a racially integrated learning environment.

3. The school district shall make provisions for staff development which prepares all staff to work successfully with all students regardless of racial, ethnic, and cultural backgrounds....

4. The school district shall maintain and update its current staff integration goals and practices and shall continue to actively seek more African–American teachers, counselors, and administrators.

Stipulated Exhibit # 18, Memo From Superintendent Daeschner, at 5 (Aug. 26, 1996).

As with Judge Gordon's 1975 plan, the 1996 plan revolves around racial composition guidelines. It requires that each school have a black student enrollment at least 15% and no more than 50%.[28] *See* Stipulated Exhibit # 18 at 5–6; Stipulated Exhibit # 19 at 2. This reflects a range above and below the system-wide average enrollment of approximately 30% black students.[29] The actual process of assigning a student involves the interaction of each student's choice with the racial composition guidelines, and with the space limitations of each school or program.

The racial guidelines influence several points of the student assignment process. First, the guidelines shape attendance boundaries that determine "resides" areas. Each student has a "resides school" serving his or her home address. This school is the default school for assignment purposes. The Board assigns a student to the resides school unless: (1) the student gains admission to another school through the application process, (2) the student has a special programmatic need, (3) the stu-

dent's resides school is at capacity, or (4) the "student's placement would cause the resides school to be out of compliance with the District's racial composition guidelines." Exhibit # 18 at 8.

At the elementary level, schools are clustered so that the combined attendance zones will produce a student population falling within the racial guidelines. At the secondary level, each school has its own attendance area (except for a small number of magnet schools, such as Central High School, which have no resides areas). If that attendance zone produces racial imbalance, the Board creates a non-contiguous satellite attendance zone to bring students into that school and comply with the guidelines. These satellite zones all fall in predominantly black neighborhoods, causing the transportation of many black students to schools in white neighborhoods. No satellite zones require transportation of white students to schools in predominantly black neighborhoods.

The racial composition guidelines also affect the application process. An elementary student may choose to attend the resides school (unless the racial composition guidelines prevent the student from attending) or may apply for a school in the cluster, for a magnet school or program, or for a transfer to a school in another cluster. Similarly, at the secondary level, an entering ninth grader may apply to any school in the district.[30] Thereafter students no longer enjoy the open enrollment option, but they may continue to apply for magnet schools and other special programs. Students may also request a

---

28. The policy further states that the district will encourage all schools to move toward the average district-wide black enrollment of approximately 30%. *See* Stipulated Exhibit # 18 at 6; Stipulated Exhibit # 19 at 2.

29. For instance, in the 1995 school year, the black student enrollment was 31.6% at the elementary level, 30.7% at the middle school level, and 28.5% at the high school level. *See* Defendants' Exhibit # 10, at 109 (containing raw data on black and "other" enrollment at each level).

30. For instance, Jefferson County's high schools include magnet schools and schools that simultaneously contain magnet programs and/or optional programs along with a non-specialized "comprehensive" program. Before the ninth grade, students have a wide range of options ranging from applying for "open enrollment" at many high schools to applying for admission to a magnet school or special program.

transfer. Middle school students enjoy a similar range of options. *See generally* Exhibit # 18.

At all grade levels, however, the district limits student applications in several ways. Many magnet and optional programs have application requirements. These requirements sometimes include academic performance criteria and teacher recommendations. All schools and programs have space limits. And, all schools observe and are ultimately governed by the racial composition guidelines. *See generally* Exhibit # 18.

When the racial guidelines do come into play in the application process, they work to deny admission based on the student's race. If the school lies near the 15% minimum black enrollment, it could accept black applicants but it would deny admission to a disproportionate number of non-black students. Conversely, if the school approaches the 50% maximum black enrollment, it would deny admission to a disproportionate number of black students. These actions maintain each school within the Board's established racial guidelines and, thus, serve to advance the Board's overall objectives.

## IV.

## THE BOARD REMAINS BOUND BY SOME ELEMENTS OF THE 1975 DESEGREGATION DECREE

Three distinct questions emerge from this review of the litigation history of desegregation in Louisville and Jefferson County: Did Judge Gordon's finding of unitariness terminate the desegregation decree? Which remedial components of the desegregation order remained in effect after 1978? Does the Board's current student assignment plan comply with the continuing order?

The Court will begin by discussing why Judge Gordon's finding of unitariness and

why his decision to withdraw from active supervision of the 1975 Decree did not constitute termination of the Decree. To do so the Court must first examine the Supreme Court's understanding of the term "unitary."

### A.

### *Dowell* Explains Provisional Unitariness

Unitariness has multiple meanings. What Judge Gordon may have meant by his use of the term will teach us a lot about the shape of the Decree after 1978. The foremost guidance on the subject of unitariness is *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). *Dowell* provides some interesting parallels and important insights on many levels. Consequently, it makes some sense to explore the factual background of the case before considering its many lessons. *See generally id.* at 240–44, 111 S.Ct. 630 (providing a more complete version of the history of desegregation litigation in Oklahoma City).[31]

Desegregation in Oklahoma City began in 1963 when a federal court found the school board operated a dual system. *See Dowell v. School Bd. of Oklahoma City Public Schools*, 219 F.Supp. 427 (W.D.Okla.1963). Two years later, the court determined that neighborhood zoning efforts failed to remedy segregation. *See Dowell v. School Bd. of Oklahoma City Public Schools*, 244 F.Supp. 971 (W.D.Okla.1965). Seven years later, the district court imposed a desegregation plan on local school authorities. *See Dowell v. Board of Education of Oklahoma City Public School*, 338 F.Supp. 1256 (W.D.Okla.), *aff'd*, 465 F.2d 1012 (10th Cir. 1972).

In 1977, the Oklahoma City school board moved to close the case and the court

---

**31.** All told, the *Dowell* litigation spanned twenty-eight years and produced, at least, one full Supreme Court opinion, three reported appellate court opinions, and six published opinions of the district court.

granted the motion in an unpublished decision. Almost a decade later, in 1985, the original plaintiffs moved to reopen, contending that the board's new student assignment plan returned the district to segregation and that the system had never achieved unitariness. The court concluded that the 1977 decision was res judicata on the question of unitariness and, furthermore, that court-ordered desegregation must end. *See Dowell v. School Bd. of Oklahoma City Public Schools*, 606 F.Supp. 1548 (W.D.Okla.1985).

On appeal, the Tenth Circuit reversed, explaining that the 1977 decision did not terminate the 1972 desegregation order but, instead, merely ended the district court's active supervision. Accordingly, the appellate court remanded to allow the plaintiffs to challenge the new student assignment plan as violative of the desegregation order. The Tenth Circuit also held that the district court would need to decide whether to lift or modify the order. *See Dowell v. School Bd. of Oklahoma City Public Schools*, 795 F.2d 1516 (10th Cir. 1986).

On remand, the district court concluded that the board had continued desegregation in good faith even though the original desegregation plan had become somewhat unworkable. The court further found that segregation, if it existed, was caused by private decision-making and economics not linked to prior school segregation. This conclusion led the district court to vacate the desegregation order. *See Dowell v. Board of Education of Oklahoma City Public Schools*, 677 F.Supp. 1503 (W.D.Okla.1987).

Again, on appeal, the Tenth Circuit reversed and explained that, under *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the district court should not have lifted the desegregation decree absent a showing of " 'grievous wrong evoked by new and unforseen conditions.' " *Dowell v. School Bd. of Oklahoma City Public Schools*, 890 F.2d 1483, 1490 (10th Cir.1989) (quoting *Swift*, 286 U.S. at

.119, 52 S.Ct. 460). The Tenth Circuit explained that, without the desegregation decree, a number of schools in Oklahoma City would again become racially identifiable one race schools. The appellate court, thus, reasoned that circumstances had not changed sufficiently to permit modifying or lifting the desegregation order. *See id.* at 1504.

The Supreme Court granted the board's petition for certiorari to resolve conflicts over the meaning of unitariness and over the standards for dissolving desegregation orders. In its opinion, the Supreme Court began by considering the meaning of unitariness. The Court stated simply that the lower courts had "been inconsistent in their use of the term 'unitary.' " 498 U.S. at 245, 111 S.Ct. 630. In some cases, a determination of unitary status meant that the school system had "completely remedied all vestiges of past discrimination." *Id.* According to the Court, when used in this manner, unitariness meant that the school district has met the mandate of *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and *Green v. New Kent County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In other cases, however, unitariness has meant no more than a finding that a board operated a "school district that has currently desegregated student assignments, whether or not that status is solely the result of a court-imposed desegregation plan." 498 U.S. at 245, 111 S.Ct. 630. Crucially, the *Dowell* Court explained that, under this second definition of unitariness, a school district might still suffer from the continuing effects of segregation. In the Court's words, "such a school district could be called unitary and nevertheless still contain vestiges of past discrimination." *Id.* The Court cautioned that it was a "mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution." *Id.* at 246, 111 S.Ct. 630. The Court doubted the utility of providing precise definitions for the terms. *See id.* Interestingly, *Dowell* did not dis-

approve of either use of the term unitary; instead, it simply noted the different uses and went on to examine the effect of each.

After this analysis, the Supreme Court turned its attention to the effect of the district court's 1977 decision and its finding of unitariness. With a piercingly concise statement, the Court explained that the 1977 decision did not provide conclusive guidance: "The District Court's 1977 order is unclear with respect to what it meant by unitary and the necessary result of that finding." *Id.* Thus, the Court upheld the Tenth Circuit's conclusion that the district court did not end the desegregation order in 1977 but instead ended only the active intervention of the federal court. The Court rested its conclusion on *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), which held that all parties deserve an unambiguous statement when a court terminates a desegregation order: "If such a decree is to be terminated or dissolved, respondents as well as the school board are entitled to a like statement from the court." 498 U.S. at 246, 111 S.Ct. 630.

Thus, *Dowell* uncritically describes a form of "provisional" unitariness justifying the withdrawal of federal court supervision, but not constituting a finding on the elimination of all vestiges. Rather than amounting to a corruption of the term unitary, the conclusion that many courts actually intend a provisional finding of unitariness makes tremendous sense. As the *Dowell* Court powerfully explained, federal courts should respect the important value of local control over education. Accordingly, the courts should make the transition away from federal court supervision as soon as appropriate. The withdrawal of the federal court's active involvement tests a school board's genuine good faith by allowing it to make unsupervised decisions. This in turn helps create an appropriate transition period during which a school board continues to act under the mandate of a desegregation order after a district court has withdrawn its active supervision.

### B.

### Judge Gordon Did Not Terminate Desegregation Decree.

■ After considering the foregoing analysis, the Court concludes that Judge Gordon's 1978 decision falls into the category of provisional unitariness.[32] By its very nature, Judge Gordon's Memorandum contained a necessary element of imprecision, which may have been purposeful, creating the ideal tension between the promise of autonomy and the threat of supervision. Remember, Judge Gordon did not have the benefit (or the burden) of the jurisprudence up through *Dowell.* The clever ambiguity of judges like Gordon and Ballantine, in fact, has helped create the kind of transition *Dowell* envisioned.

At some points in the opinion, Judge Gordon appears to have stated that the Board had eliminated all vestiges. The opinion is replete with references to either

---

**32.** Defendants have suggested that *Dowell* might impose a new rule of decision dictating special caution in its retroactive application. For two reasons, the Court does not hesitate in applying *Dowell* to this case: First, *Dowell* does not alter the need for a finding of unitariness; instead, it merely explains the inconsistent meanings of unitariness as used by various federal courts. *Dowell* also explains the implications of *Pasadena City Board of Education v. Spangler,* a 1976 decision. To the extent that the Court employs this portion of *Dowell,* that opinion does not impose a new rule of decision—it is just explanatory. Furthermore, even if *Dowell* is read to impose the new rule that a desegregation decree remains in effect until expressly dissolved, this Court is not applying that decisional rule to reopen a seemingly closed matter. Instead, this Court concludes that Judge Gordon expressly continued some components of the desegregation decree, leaving open only the question of which components endured. Second, to the extent the Court might apply the part of *Dowell* stating the standards for dissolving a desegregation decree, no danger of retroactivity arises. If the Court ends up considering the appropriateness of modifying or terminating the continuing elements of the 1975 order, it would not be applying *Dowell* retroactively to a determination made in previously closed litigation.

the complete successful implementation of the order or to the school district's compliance with the order. In other places, however, Judge Gordon suggested that problems persist by cautioning the Board that it must continue to comply with the continuing desegregation order.

Judge Gordon did reach clear findings about the Board's good faith. But, by perpetuating the desegregation decree, he left a muddy picture of whether the school system had "completely remedied all vestiges of past discrimination." *Dowell,* 498 U.S. at 245, 111 S.Ct. 630. Judge Gordon's continuation of the Decree suggested that, although the school system "currently desegregated student assignments," *id.,* the system might appear unitary only because of "a court-imposed desegregation plan," *id.* Thus, the best the Court can say is that the 1978 decision fits as neatly as possible within the provisional unitariness category.

The precise delineation of Judge Gordon's findings on unitariness do not matter. Functionally, Judge Gordon's finding was clearly one of provisional unitariness ending only the active supervision of desegregation by the district court along with certain specified and unspecified portions of the decree.[33] As the *Dowell* Court explained, *Spangler* requires an unambiguous articulation of whether a desegregation decree is terminated or whether it continues. Without a doubt, Judge Gordon stated this fact unambiguously—he intended some portions of the decree to continue.

Any number of passages from the opinion amply support this conclusion. For example, in the pupil desegregation portion of the opinion, Judge Gordon stated:

The requirement of the Fourteenth Amendment of the United States Constitution limiting the power of the district courts to redress only unconstitutional state action after a school system has, through remedial action, been made unitary will not impede this Court from enforcing such portions of its desegregation order as are of a continuing nature.

1978 Mem.Op. at 12. Admittedly, this same section causes as much confusion as clarity. While Judge Gordon implied that he would continue to enforce his order, he had just stated in the previous paragraph that the Jefferson County schools had attained "compliance as measured against the 'guidelines' for pupil racial composition." *Id.* He then explained that:

Thus, the Jefferson County school system has now moved to the "post-compliance" state of implementation of the Supreme Court's decision in [*Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) ]. Accordingly, the decision in *Cunningham v. Grayson,* 541 F.2d 538 (6th Cir.1976) now controls the question of the power of this Court to compel year-to-year realignment.

*Id.* (citation omitted).

An even more convincing statement of Judge Gordon's intent to continue some

---

33. While of little or no weight, the Court notes with interest that newspaper articles covering Judge Gordon's announcement might provide some indication of the contemporaneous construction given to the decision. Uniformly, the local newspapers' interpretation then is the same as the Court's now. *See* Clay Ryce & Dianne Aprile, *Gordon Withdraws From County School Desegregation Case,* The Louisville Times, at A1 (June 19, 1978) ("Gordon's order in effect turns the responsibility for monitoring the schools desegregation process over to school Supt. E.C. Grayson"); Michael Wines, *A Few Words Finish Fight for Desegregation,* The Louisville Times, at A1 (June 19, 1978) ("the duty to insure that the desegregation order is being

met now will rest fully on Supt. E.C. Grayson and the 11–member Jefferson County school board"); Dick Kaukas, *Judge Gordon Ends His Role in School Desegregation Case,* The Courier–Journal, at A1 (June 17, 1978) (explaining that the order "does not, however, alter the desegregation plan" and that "Gordon said he expected the school system to keep it intact"); Bob Johnson, *Judge Leaves Driver's Seat But Buses Will Still Roll,* The Courier–Journal, at A1 (June 17, 1978) (explaining that the school will reopen in August 1978 still "legally obligated to provide a desegregated education" and that "Gordon's departure will have little practical effect on how the schools will operate").

aspects of the desegregation order appears in the section on monitoring:

> The Court has considered the many suggestions for various forms of monitoring of further implementation of the desegregation order and has determined that as the system has now been determined to be a unitary one, it must accept immediately the yoke of monitoring its own activities as they affect the constitutional rights of young people as adjudicated in this action. The school board and its administration are expected by this Court to continue to implement those portions of the desegregation order which are by their nature of a continuing effect.

> It is anticipated that the defendants will comply with the desegregation order; otherwise, this Court would not consider withdrawing its active monitoring of the implementation of its desegregation order.

*Id.* at 18. Thus, Judge Gordon seems to have expressly envisioned that some parts of that order would have a natural continuing effect.

This conclusion is strengthened by the inclusion in the opinion of five "recommendations" for the future "implementation of the Court's desegregation order." *Id.* at 19–21.[34] These recommendations suggest an understanding between Judge Gordon and the Board: even without his active involvement, the Board would continue to administer the desegregation decree.

Any doubt about status of the desegregation order after the 1978 opinion is entirely removed by a reading of Judge Gordon's conclusion and his Final Judgment. The opinion ends with Judge Gordon's parting advice to Board:

> While this Court cannot admonish the present school board too strongly of the necessity of the continuation of the good

faith implementation of the desegregation order as amended, it does not anticipate that a reopening of this matter will be necessary.

*Id.* at 24. This final nicely-turned phrase hangs precariously between threat and promise. Even more importantly, the Final Judgment explicitly provides that the end of active intervention did not terminate the continuing nature of the desegregation decree:

> The continuing nature of any previously entered order which is inconsistent with the cessation of active monitoring by this Court of the implementation of its amended desegregation order is hereby terminated. The continuing nature of the orders of this Court in this matter which are not inconsistent with this Court's termination of its jurisdiction for the purpose of monitoring the implementation of its amended desegregation order is in no way affected hereby. . . .

> . . . To aid the Board of Education and its Superintendent in fulfilling their charge of implementing such portions of this Court's amended desegration order as are of a continuing nature, the Superintendent is hereby directed to prepare and submit to the Board in a regularly scheduled meeting in the months of November, 1978, 1979 and 1980 the following data. . . .

1978 Final J. at 1–2.

Never did Judge Gordon directly or unambiguously dissolve the Decree. In the Court's view this was not an oversight. To be sure, Judge Gordon wanted out of the school business. Just as surely he wanted the Board to continue following the basic thrust of his Decree. He surely would have acted had the Board shown the bad judgment not to do so.

---

**34.** Specifically, the judge suggested that the Board continue the human relations program, that it monitor the racial disparity in suspensions, that it weigh the impact of school closings on desegregation, that it study the effect of optional programs and curricular programs on desegregation, and that it develop improved methods to supervise students and ensure they attend their assigned school.

The conclusion that the Decree remains alive today may be more than a little surprising to some. However, a comparison of the *Haycraft* litigation to a typical suit for injunctive relief should lessen that surprise. With a normal, non-desegregation injunction, the court enters a permanent injunction, closes the case, and the injunction lives on. Rarely would a court retain jurisdiction to ensure compliance. Desegregation cases are the exception to the norm. Typically, courts resorted to placing the school system in virtual receivership because they confronted school districts' persistent and active opposition to desegregation.[35] In other words, if the *Haycraft* litigation had been a typical suit for an injunction, it would surprise no one to learn that the order remained in place after the judge closed the case.

Nothing in Judge Ballantine's 1985 opinion alters this Court's analysis. While Judge Ballantine added some gloss to the 1978 decision by explaining that Judge Gordon held "that the dual system had been eliminated," 1985 Mem.Op. at 5, he did not litigate the issue of unitariness. Nor did he change the shape of the continuing decree. Instead, he seems to have presumed the Board's continued compliance with the desegregation decree. For instance, he mentioned that the Board created new attendance zones "to achieve an appropriate racial balance in each school" as defined by the 1975 guidelines. *Id.* at 3. Judge Ballantine simply refused to reopen the file. His decision cannot be character-

ized, therefore, as altering the posture of the case after 1978.[36]

This case differs from *Dowell* in an important manner. In *Dowell* there was some dispute over whether the desegregation decree continued or whether the 1977 decision to close the case also lifted the decree. Here, while Judge Gordon was not "crystal clear" about his use of the word "unitary," he did plainly state that appropriate portions the Decree continued in effect. Judges Gordon and Ballantine probably had excellent reasons for never precisely and unambiguously stating that the Decree was dissolved and of no further effect. The Board may have had good reasons for never requesting such a statement. Regardless, the essential fact is that no judge has ended the Decree. This Court concludes, like the Tenth Circuit interpreting the 1977 decision in *Dowell*, that Judge Gordon ended judicial supervision of the desegregation decree, but did not dissolve the order itself.

### C.

### The Continuing Decree Requires the Board to Prevent Return of Racially Identifiable Schools

■ The Court must now determine which portions of Judge Gordon's 1975 Decree remain effective today. Before heading down that road, the Court must add a caveat. If Judge Gordon had precisely detailed the ongoing components of his order, then this case and the 1985 litigation might not ever have arisen. Given the

---

35. *See supra* note 14.

36. Again, the Court finds the newspaper coverage of Judge Ballantine's decision interesting, although less supportive of this Court's legal conclusions than the coverage of Judge Gordon's 1978 decision. *See* Kit Lively, *Ruling Could End Court's Desegregation Role in Schools,* The Louisville Times, at A9 (Sept. 26, 1985) (stating that the decision "could forever free the Jefferson County public schools from seeking federal court approval before changing its desegregation plan" and that the ruling meant that "federal courts no longer have an active role in desegregation of local schools, unless the school system intentionally sets out

to resegregate the schools"); Al Cross, *Judge Frees Schools From Busing–Change Review,* The Courier–Journal, at A1 (Sept. 26, 1985) (explaining that the ruling meant that the "Jefferson County Board of Education doesn't have to get federal court approval to change its desegregation plan" and that the decision "could permanently close the books on the 15–year–old lawsuit that forced integration of the county's public schools" but also stating that Ballantine ruled that "once a system is declared desegregated, federal courts lose authority over busing plans unless plaintiffs show the plans aimed at resegregation").

ambiguity of the 1978 decision and given the delicate fact-sensitivity of any desegregation case, the Court does not expect to find and apply any bright-line rules allowing a quick and easy distinction between those aspects of the Decree that terminated and those portions that continued. Rather than finding an answer in precision, the Court anticipates instead looking to the unique path of the *Haycraft* litigation. As the Supreme Court instructed in *Dowell,* the question of whether a decree continues depends on how a given district judge chose to use the term unitary. The logical corollary of this proposition is that the scope of a continuing decree singularly depends upon the particular local history of desegregation.

■ From the legal legacy of desegregation in Jefferson County, therefore, the Court must determine the shape of the continuing Decree. Several broad legal principles guide the Court. Indeed, the terms of the ongoing order seem most importantly governed, on the one hand, by proper deference to the local school board and, on the other hand, by the need to provide continuing protection to individuals who might suffer the effects of any possibly lingering vestiges of segregation. In addition to these general considerations, the Court must keep two slightly narrower legal rules firmly in mind: first, the nature of any desegregation order must relate to the violation to be remedied; and, second, the order must provide a precise statement of the school district's obligations. At times, these interests and principles conflict with each other; and any balancing of them, of necessity, embodies imprecise and even rough determinations. *Cf. Tilton v. Richardson,* 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) ("Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics.").

Fundamentally, Judge Gordon premised the 1978 decision to withdraw federal court supervision on the good faith of the Board in implementing the 1975 Decree. Accord-ingly, he ended the monitoring, enforcement, and implementation provisions of the Decree and returned autonomous administrative control to the Board directing it only to comply with the continuing aspects of his desegregation order. Of necessity, Judge Gordon's action carries with it the decision to leave in place only a bare bones decree that would allow the Board a range of discretion to fashion appropriate educational policy in the long term. Such a decision makes sense given Judge Gordon's confidence in the Board and his praise for its conscientiousness. The task, therefore, is to identify any specific components or general commands of the decree that continued.

The return of managerial control to the Board is simply inconsistent with the many specific requirements of the original 1975 Decree. If the continuing Decree required alphabetical busing and the myriad of other specified policies, it would not conform to Judge Gordon's decision to restore educational decision-making to the discretion to the Board. Consequently, the Court concludes that these details dropped away.

The continuing Decree, however, must impose a remedial obligation on the Board. The shape of that obligation can be discerned only with reference to the vestiges of segregation identified by the Sixth Circuit in *Newburg Area Council, Inc. v. Board of Education of Jefferson County,* 489 F.2d 925 (6th Cir.1973). The appellate court found that the presence of racially identifiable pre-*Brown* schools in Louisville and Jefferson County constituted a vestige of segregation. Accordingly, the continuing decree must address, and help to remedy, this problem. In the language of *Swann,* "the nature of the violation determines the scope of the remedy." 402 U.S. at 16, 91 S.Ct. 1267. Or, as the Supreme Court stated in *Milliken II,* "the well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and

relate to the constitutional violation itself." 433 U.S. at 281–82, 97 S.Ct. 2749.

This precept means that a desegregation decree must strike directly at the wrong of racially identifiable schools. Thus, the continuing Decree must work to remove the vestige of discrimination—it must alleviate the racial identifiability of schools in Jefferson County. Crucially, and problematically, the decree must achieve this result while still allowing the Board to set educational policy. The Court sees only one possible outcome: The continuing decree obligates the Board to do no more and no less than to operate a school system free from the vestige of racially identifiable schools.

Admittedly, the 1975 order states this command in no single paragraph or sentence. However, no one could dispute that such a mandate was its central purpose. The Court infers this mandate from the intent of the order, from its structure, and from all of its particulars. Despite the deductive nature of this task, the Court is confident in the outcome. Given the necessary balancing of interests and principles, no other conclusion is possible.

In 1975, Judge Gordon stated that his order would extend over a number of years. In 1978, he admonished the Board concerning the necessity of continuing to implement the decree in good faith. Judge Gordon, thus, left the duration of the decree hanging in the air. This Court cannot imagine Judge Gordon intended all of the precise and particular details of the 1975 Decree to remain in place indefinitely. Instead, given the basic decision to return decision-making power to the Board and given the unstated duration of the continuing order, the Court believes that Judge Gordon intended for the Board to carry on the fundamental intent of the Decree whether or not the Board continued to implement the order in the exact manner originally envisioned.

The Court draws strength for the foregoing conclusions from the requirement that all parties deserve a precise and specific statement of obligations under a desegregation decree. *See Dowell,* 498 U.S. at 246, 111 S.Ct. 630; *Spangler,* 427 U.S. at 438–39, 96 S.Ct. 2697. The application of this concept leads to the conclusion that only obligations of an indisputable nature should continue after 1978. Again, an examination of the Decree, in the context of the 1978 decision to return administrative control to the Board, leads the Court to conclude that only a prohibition on racially identifiable schools constitutes the sort of indisputable obligation that merits continuation.

Judge Gordon's Decree and his 1978 Memorandum remain the essential legal background of this case. Judge Gordon's words and the Board's actions over the years have given moral and practical weight to the Decree's continuing legal force. The Court must give each due respect. Regardless of its prior statements, the Board has treated the Decree's controlling tenet—preventing the appearance of racially identifiable schools—as a continuing obligation. The Court cannot simply ignore this history. The painful reality of state sponsored segregation and constitutionally mandated desegregation requires that this Court respectfully consider and delicately balance existing legal commands, neither ignoring them nor perpetuating them unnecessarily. This requires a process, not mere judicial fiat. This Memorandum Opinion defines that process.

None of this should imply that the Court has succeeded or even attempted to sweep all the chessmen off the board.[37] Over the

---

**37.** For instance, one might justifiably ask how this Memorandum squares with the statement that once a school board complies with the racial balance requirements of a desegregation order, the federal court cannot mandate annual realignment. *See Cunningham,* 541 F.2d at 542. The best answer may be that, while a court may not order realignment, a board may get to realign as part of its compliance with a more general desegregation decree.

years, judges have struggled with and disagreed about the application of these principles in many different circumstances. "No court can have a confident solution for a legal problem so closely interwoven with political, social and moral threads." *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 849 (5th Cir.1966) (Wisdom, J.). In the final analysis, it is probably time to address directly the issues which Judges Gordon and Ballantine so skillfully and properly delayed. The Board and the community are entitled to an unambiguous statement about whether any legal obligations of the Decree continue. This Memorandum outlines a process for fairly and openly deciding that issue.

## D.

### The Continuing Decree Permits the Board's Current Student Assignment Plan

██ The continuing Decree has power that this Court cannot ignore.[38] Judge Gordon's continuing order serves to protect the rights of all those injured by any remaining vestiges of discrimination.[39] When the Board acts pursuant to the continuing Decree, it acts lawfully. Conversely, the continuing Decree should end if vestiges of discrimination no longer blight the Jefferson County school system. The continuing desegregation decree affects this case, however, only if the Board's policies fall under its aegis. Obviously, the Board currently possesses considerable discretion to enact student assignment policies to meet its continuing obligations under the Decree. While, theoretically, many techniques might achieve the goal of

preventing racially identifiable schools, the Board has chosen—tellingly—to stay with the device of racial composition guidelines first imposed by Judge Gordon in the 1975 Decree.

For several reasons, the Court concludes that the continuing Decree encompasses the 1996 Student Assignment Plan. First, the present plan and its racial guidelines achieve the goal of preventing racially identifiable schools. Second, the managed choice plan accomplishes this result in a far less burdensome manner than the mandatory alphabetical busing plan. And, third, the Board has not adopted a new, and allegedly unconstitutional, student assignment device for ensuring compliance with the Decree. Instead, the Board has perpetuated, without interruption although with adjustment, the racial composition guidelines originally put in place by Judge Gordon. These three points establish that the Board has followed the command of the continuing Decree and that it has done so with great concern for the effect upon students and parents.

Because the Board's Student Assignment Plan and its racial composition guidelines have served the essential purpose of complying with the continuing Decree, the Court concludes that the Decree protects these policies from attack. So long as that order remains in force, it permits the use of various approaches to address the danger of racially identifiable schools. While the Decree does not mandate that the Board use one particular means of avoiding racially identifiable schools, it does allow the Board to achieve compliance through the use of reasonable policies.[40]

---

**38.** *See N.L.R.B. v. Local 282, Int'l Bhd. of Teamsters*, 428 F.2d 994, 999 (2d Cir.1970) ("where . . . a permanent injunction is violated, the interest in enforcement consists not only of the need to maintain respect for court orders and for judicial procedures, but also of the need to avoid repetitious litigation").

**39.** "Proper analysis of [a district court's desegregation orders] must rest upon their serving as proper means to the end of restoring the victims of discriminatory conduct to the

position they would have occupied in the absence of that conduct and their eventual restoration of state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Missouri v. Jenkins*, 515 U.S. 70, 89, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (internal quotation marks omitted).

**40.** Because the Board has decided to comply with the continuing Decree by converting the once mandatory racial composition guidelines

Plaintiffs challenge both the use of racial composition guidelines in the creation of satellite attendance zones and in the magnet school application process. Because those racial composition guidelines flow directly from the requirements of the continuing Decree, the Court finds that Plaintiffs cannot do so without first dissolving the Decree.[41]

Since the Plaintiffs are the masters of their case, the Court cannot sua sponte transform this case into a suit seeking the dissolution of the desegregation decree. Instead, Plaintiffs must make that decision for themselves. The Court will enter an order according Plaintiffs ample time to make that choice. Plaintiffs, or another party, must move to dissolve the continuing Decree in order for this case to proceed. While this choice is a significant one, a straightforward motion asserting the legal requirements is all that is necessary to initiate the process. In all likelihood the Court will set a hearing on the motion.

## V.

## TO TERMINATE THE DECREE A MOVANT MUST PROVE THE BOARD'S CONTINUED GOOD FAITH AND THE ELIMINATION OF VESTIGES TO THE EXTENT PRACTICABLE

Lifting the continuing Decree would have real consequences for the Board, the community, and Plaintiffs. At once, it would provide much broader discretion and some narrower restraints on future Board actions. On one hand, it would mean that the Board would be free to adopt any constitutional student assignment plan. On the other hand, the Decree

into a voluntary policy, the 1996 Student Assignment Plan does not run afoul of the rule that a court may not order annual realignment to maintain racially neutral schools. *See Cunningham v. Grayson,* 541 F.2d 538, 542 (6th Cir.1976) (prohibiting Judge Gordon from ordering "year-to-year realignment to correct non-state action-caused divergencies from the racial guidelines"). As Judge Gordon noted in 1978, *Cunningham* "control[s] the question of the power of this Court to compel year-to-year realignment." 1978 Mem.Op. at 12. Rather than requiring annual adjustment, the continuing Decree allows the Board to avoid racially identifiable schools through whatever appropriate means it selects.

**41.** If the Court were to proceed in this manner and eventually conclude that the desegregation order must end, then it seems possible that everything might return to the status quo ante. Possibly, the Board could argue that its student assignment plan constitutes an valid enactment independent of the continuing Decree. (Although the propriety of this approach may require some investigation.) If so, the question would be, as all have assumed up until now, whether the student assignment plan could pass scrutiny under the Equal Protection Clause. The *Dowell* Court contemplated an analogous situation in Oklahoma City: "A school district which has been released from an injunction imposing a desegregation plan no longer requires court authorization for the promulgation of policies and rules regulating matters such as assignment of students and the like, but it of course remains subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment." *Dowell,* 498 U.S. at 250, 111 S.Ct. 630.

In any event, even if the Court found it proper to terminate the desegregation order, it would seem a difficult argument to contend that the Board's past actions violated any statutory or constitutional provision. Since both Judge Gordon and Judge Ballantine praised the Board's good faith in following the order, it would seem unlikely that the Board committed any misconduct. In fact, the Supreme Court appears to have focused on a similar point in a footnote to *Dowell:*

The Court of Appeals viewed the Board's adoption of the SRP [Student Reassignment Plan] as a violation of its obligation under the injunction, and technically it may well have been. But just as the Court of Appeals held that the respondent should not be penalized for failure to appeal from an order that by hindsight was ambiguous, we do not think that the Board should be penalized for relying on the express language of that order. The District Court in its decision on remand should not treat the adoption of the SRP as a breach of good faith on the part of the Board.

*Id.* at 249 n. 1, 111 S.Ct. 630.

Of course, any determination on this point might require more evidence.

would no longer automatically shield the Board's use of racial classifications to achieve its goals. The Board would face a much higher legal burden to justify such policies. Obviously, the Court could not limit the effect of these changes to just Central High School or even just to the secondary schools. Everyone involved should consider these possibilities in making their choices.

To facilitate those choices, the Court will devote the remainder of this opinion to a brief analysis of the standards for dissolving a desegregation decree in light of the facts of this case. This portion of the opinion should assist Plaintiffs in assessing their evidentiary burden should they decide to pursue the dissolution of the continuing Decree.[42]

■ Of course, *Dowell* provides the incredibly straightforward standard that a desegregation decree terminates upon a showing of continued good faith and the elimination of the vestiges of segregation to the extent practicable. *See* 498 U.S. at 250–51, 111 S.Ct. 630.[43] On the question of good faith, *Dowell* teaches that a board's course of conduct provides the most relevant evidence. Meanwhile, *Dowell's* guidance on vestiges leaves something to be desired. The Court did direct attention to

whether vestiges remain in any of a number of areas of the school system, but it provided little other assistance. In general, however, *Dowell* reminds us of the overriding logic of allowing the dissolution of a desegregation decree: returning control of schools to local authorities. *See id.* at 247–248, 111 S.Ct. 630 (citing the seminal cases of *Brown* and *Green* ).[44]

In *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Supreme Court sets out more helpful standards for determining good faith and for ascertaining whether evidence of racial imbalance constitutes a vestige of discrimination. For instance, in the context of allowing a district court to terminate certain elements of a broad desegregation decree, the *Freeman* Court explained that good faith depends upon a number of considerations:

Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance

---

**42.** The Court notes two cases that provide invaluable guidance on how a district court should analyze the appropriateness of terminating a desegregation order: *Dowell v. Board of Education of the Oklahoma City Public Schools,* 778 F.Supp. 1144 (W.D.Okla.1991) (*Dowell* on remand from the Supreme Court) and *Brown v. Board of Education of Topeka,* 892 F.2d 851 (10th Cir.1989). Both of these cases demonstrate the evidentiary complexity and the allocation of burdens involved in proving that a school district no longer suffers from the vestiges of past discrimination and, accordingly, that a desegregation order should terminate.

**43.** The *Dowell* Court considered but rejected the far more stringent *Swift* requirement of "grievous wrong evoked by new and unforeseen circumstances" imposed by the Tenth Circuit. *See* 498 U.S. at 246, 111 S.Ct. 630. The Court explained "[c]onsiderations based on the allocation of powers within our federal

system," *id.* at 248, 111 S.Ct. 630, dictated a lower standard for the end to desegregation orders. Unlike other injunctions, school desegregation decrees "are not intended to operate in perpetuity." *Id.*

**44.** As the Court explained:

The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.

*Id.* at 248, 111 S.Ct. 630 (internal quotation marks deleted).

with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

In considering these factors, a court should give particular attention to the school system's record of compliance. A school system is better positioned to demonstrate its good faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And, with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

*Id.* at 491–92, 112 S.Ct. 1430.

The decisions of Judge Gordon and Judge Ballantine would seem to provide particularly important evidence on the question of past good faith. They may even have some res judicata effect on the Board's conduct. While this matter has not been fully explored, the Board's policies over the years since 1985 seem to demonstrate a commitment to the principles which Judge Gordon established. On the other hand, Plaintiffs have impugned the Board's good faith extensively in earlier hearings by suggesting that the Board has discriminated against black students by burdening them disproportionately with the ills of busing and by devising a system that sends black students to the less effective schools in the Jefferson County system. Similarly, in earlier hearings, the Board made many assertions about its own good faith and about the elimination of discrimination in the Jefferson County schools. Some of these statements may constitute evidence of conduct or of fact.

If this case does go forward, the Court will need to resolve the questions of good faith based not on the professions of one party or the other, but based on factual evidence.

In *Freeman,* the Court also provided some analytical assistance about whether a racial imbalance constitutes a vestige of discrimination. Specifically, the *Freeman* Court discussed the causal link necessary to prove that an unequal racial pattern is, indeed, a vestige of discrimination. *See id.* at 494–96, 112 S.Ct. 1430. The Court began with the idea that racial balance holds no significance without evidence of a link to earlier segregation:

Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. . . . If the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance, that condition must be remedied. The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation. . . .

Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. . . .

. . . The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation. And the law need not proceed on that premise.

As the de jure violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a

school district is a vestige of the prior de jure system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith.

*Id.*

Thus, *Freeman* addresses some of the general facts of this case: the de jure violation occurred long in the past, the Board alleges that a racial imbalance will occur without the racial composition guidelines, and there appears to be abundant evidence of the Board's good faith (although, of course, the Court has formed no conclusions on this point). Crucial differences with *Freeman* also abound. Unlike that case, this one does not seem to involve evidence of racial imbalances occurring in areas of demographic change. On the contrary, and just superficially, it would appear that the alleged racial imbalances might occur in many of the same schools or neighborhoods where the Sixth Circuit found vestiges of discrimination in 1973.

Another important distinction pertains. This case involves claims of "concealed" or "latent" racial imbalances.[45] The Board has argued, although in a hearing on a different legal issue, that if this Court lifts the racial composition guidelines, then many schools may return to a racially identifiable condition. If this were a "current imbalance" it would invoke the rule, stated in *Freeman*, that the party seeking termination of the desegregation decree, "bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Id.*

at 494, 112 S.Ct. 1430. However, the Board's claims are not allegations of a current imbalance, but of an alleged future imbalance. Because of this distinction, the Court does not believe that the *Swann* presumption of causation, as restated in *Freeman*, arises automatically. Instead, the Court may require substantial proof of the likelihood that a racial imbalance will re-emerge. The Board has already introduced some evidence about the prospects for the occurrence of "resegregation" in Jefferson County absent the guidelines. Whether a racial imbalance is likely to occur and whether the occurrence, even if likely, constitutes a vestige of past discrimination, remains unclear and undecided.

Another useful comment appears in *Freeman*. The Court considered whether racial balancing in the schools, even if no longer required to redress a vestige in student assignments, could serve to correct another vestige of discrimination. The Court concluded that the answer depended upon the evidence of a specific interconnection of various *Green* factors in the particular school system:

> We next consider whether retention of judicial control over student attendance is necessary or practicable to achieve compliance in other facets of the school system. Racial balancing in elementary and secondary school student assignment may be a legitimate remedial device to correct other fundamental inequities that were themselves caused by the constitutional violation. We have long recognized that the *Green* factors may be related or interdependent. Two or

---

45. The concept of "concealed" or "latent" vestiges seems to appear in *Dowell* although the Supreme Court does not formally name the idea. Specifically, *Dowell* stated that courts often found provisional unitariness when a "school district ... has currently desegregated student assignments, whether or not that status is solely the result of a court-imposed desegregation plan." 498 U.S. at 245, 111 S.Ct. 630. In these circumstances, "such a school district could be called unitary and nevertheless still contain vestiges of past discrimination." *Id.* The Court contrasted this situation with a fully unitary school system in which a board has "completely remedies all vestiges of past discrimination." *Id.* This distinction suggests that in a provisionally unitary system, vestiges of segregation may remain even if those vestiges have no facial manifestation. Indeed, a court would not terminate its supervision if visible vestiges still afflicted the school system. In other words, an effective desegregation order may act to *conceal* vestiges; the termination of the desegregation decree might cause these *latent* vestiges to re-emerge.

more *Green* factors may be intertwined or synergistic in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well. *Id.* at 497, 112 S.Ct. 1430.

This idea may provide very little help in this case, however. No one has suggested that any court ever identified vestiges of discrimination or ever mandated a remedy in any area other than student and staff assignments. It, therefore, seems difficult to imagine how the other *Green* factors will play very much of a role in any litigation over the propriety of dissolving Judge Gordon's continuing Decree. Of course, as directed by *Dowell,* the Court remains open to evidence of vestiges in other facets of the school system. Thus, the question of whether the Court will need to consider all the *Green* factors, or just a few, or only student assignments, depends on the evidence eventually amassed and presented by the parties.

In sum, then, for the continuing Decree to terminate, the Court requires proof of the Board's good faith and of an absence of vestiges to the extent practicable. Where the alleged vestiges come in the form of "concealed" or "latent" racial imbalances, the Court will require proof that such alleged future imbalances will occur. Obviously, the party seeking to continue the Decree would normally present this proof. Upon receiving such proof, the burden will shift[46] to the party seeking to dissolve the Decree. *See Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *Agostini v. Felton,* 521 U.S. 203, 214–15, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In this case, that means the Plaintiffs bear the burden of showing good faith and no vestiges.[47]

**46.** As described in both *Swann* and *Freeman,* in a previously segregated system, the presence of a racial imbalance (such as a superficially racially identifiable school), causes the party opposing the claim of vestiges to prove that nothing links the suspicious condition to the earlier constitutional violation.

**47.** While *Dowell* does not explicitly authorize a challenge to a desegregation decree by a nonparty, the Court sees no reason that Plaintiffs could not move for the termination of the continuing Decree. While *Dowell* phrased its standard of continued good faith and no vestiges as a burden on the school board, the Court believes that another litigant could shoulder the same burden. It might make some sense to impose an additional requirement on a nonparty. Perhaps when a party other than the board moves to modify or dissolve a desegregation order, that party should have to demonstrate some harm flowing from that order. This burden might be no different from the normal requirements of standing. Here, even if some additional burden were imposed, it would seem that Plaintiffs have met such a burden by establishing the Student Assignment Plan (protected by the desegregation order) contains at least one racial classification that acts to deny them admission to schools on an equal basis as non-black students.

In *United States v. Board of School Commissioners,* 128 F.3d 507 (7th Cir.1997) (Posner, C.J.), the Seventh Circuit considered whether a nonparty to an injunction could obtain relief from that order. Chief Judge Posner reasoned that nonparties should be allowed to seek relief because otherwise a party placed under an court order would possess more rights than an innocent nonparty injured by the court's exercise of equitable power. As Posner explained:

> [T]he important point [is] that any person bound and significantly constrained by an equitable decree may present evidence to show that the decree should be lifted even if the primary wrongdoer is someone else. "A defendant may move to dissolve an injunction if it injuriously affects his interests, although the order is not against him," *In re Hendrix,* 986 F.2d 195, 197 (7th Cir. 1993) (quoting *Hall v. Orlikowski Construction Co.,* 24 Ill.App.3d 60, 321 N.E.2d 23, 25 (1974)), as may a nonparty who is bound by the injunction. *Memorial Health Systems, Inc. v. Halifax Hospice, Inc.,* 689 So.2d 373 (Fla.App.1997). Any other rule would give more rights to an adjudicated wrongdoer than to an innocent person forced to bear many of the costs of the wrongdoing; we cannot see what sense that would make.

*Id.* at 511.

This Court generally agrees with Chief Judge Posner and, furthermore, believes that the Supreme Court's reasoning in *Dowell* and the Equal Protection Clause demand the same result. *Dowell* explains that citizens have an interest in locally autonomous school boards. The public should not have to depend on a

On the question of vestiges, the party seeking termination of the Decree can rely to some extent on the passage of time, the long-term compliance with a racial balance decree, and the continued good faith of the Board (assuming, the latter two are established). Nevertheless, the party seeking the change bears the burden of showing that no causal link connects proven probable future racial imbalance to vestiges of desegregation. Among the many ways of proving alternate causation, the party seeking dissolution may offer proof that the racial imbalance arises from demographic change or private choice rather than having any connection to previous governmental misconduct.

## VI.

### CONCLUSION

This Memorandum Opinion should focus the parties' attention on important new issues central to the future conduct of education policy in Jefferson County. The changes in focus require a few minor adjustments in the case itself.

Now that the continuing Decree is at issue, the Court will revisit its earlier order and permit the Fair Housing Council, Inc. the Kentucky Council for Human Relations, Inc., and Quality Education for All Students, Inc. to intervene as Plaintiffs. The Court will consider similar requests by other organizations or individuals with an interest in the future validity of the Decree.

Because its decree is now at issue, the Court could reopen *Haycraft*. However, the Court finds that such a procedure is unnecessary at this time. The question of the Decree's continued validity is properly raised in this litigation. All necessary parties are either present or could be present to decide the issue. If eventually necessary, the Court could temporarily reopen *Haycraft* for the sole and limited purpose of dissolving the Decree.

The Court will enter an Order consistent with this Memorandum Opinion.

### ORDER

The Court has carefully reviewed Judge Gordon's 1975 Decree, the events which have transpired since and has considered the argument of counsel. The Court has set forth its views at some length and detail in the accompanying Memorandum Opinion. The Court concludes that only the following orders are necessary at this time and being otherwise sufficiently advised,

IT IS HEREBY ORDERED AND ADJUDGED that Judge Gordon's 1978 Order did not dissolve his 1975 Desegregation Decree and that, explained in the Court's Memorandum Opinion, certain provisions of that Decree remain in force and effect.

IT IS FURTHER ORDERED AND ADJUDGED that the Decree permits the Board's use of racial classifications to prevent re-emergence of racially identifiable schools.

IT IS FURTHER ORDERED that any party may move to dissolve the remaining portions of the Decree and the parties shall have to and including **July 12, 1999,** in which to file such a motion. Parties opposing such a motion shall have ten days to respond.

IT IS FURTHER ORDERED that the Court reconsiders its prior order and now sustains the motions to intervene by the Fair Housing Council, Inc., the Kentucky

---

school board to seek the termination of a decree when the board appears comfortable with its obligations under that order even though members of the public feel injured by the Decree. More importantly, the Constitution forbids a school board from conducting otherwise impermissible discrimination under the guise of a moribund desegregation order.

This conclusion is made possible by the presence of all relevant parties. The Intervening Plaintiffs step into the role occupied by the original desegregation plaintiffs. If, however, additional parties feel that this suit should not proceed without their presence, the Court would consider new motions to intervene.

Council for Human Relations, Inc., and Quality Education for All Students, Inc.

IT IS FURTHER ORDERED that any party having an interest in the continuation or dissolution of the Decree shall have to and including **July 12, 1999,** to move for leave to intervene in this case.